## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **CYNTHIA J.,** | |
| **Plaintiff,** | **8:24CV253** |
| **vs.** | |
| **FRANK BISIGNANO,[1] Commissioner of Social Security,** | **FINDINGS AND RECOMMENDATION** |
| **Defendant.** | |

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final administrative decision of the Commissioner of Social Security ("Commissioner"). Plaintiff has filed a Motion for Order Reversing Decision of the Commissioner (Filing No. 14). The Commissioner filed a Motion to Affirm Commissioner's Decision (Filing No. 19). The matter was referred to the undersigned magistrate judge to issue a Findings and Recommendation pursuant to 28 U.S.C. § 636 by the Honorable Susan M. Bazis, United States District Court Judge. Being fully advised in the premises, the undersigned magistrate judge now finds and recommends that Plaintiff's motion to reverse and remand be granted, and that the Commissioner's motion to affirm be denied.

### PROCEDURAL BACKGROUND

On August 23, 2021, Plaintiff protectively filed a Title XVI application for supplemental social security income ("SSI"), and on August 28, 2021, filed a Title II application for disability and disability insurance benefits. Plaintiff alleges disability beginning March 2, 2020. The claims were denied initially, and upon reconsideration on February 17, 2023. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on February 27, 2023. (Filing No. 7-2; Tr. 14).

Plaintiff and counsel appeared for a video hearing before the ALJ on July 6, 2023. On September 14, 2023, the ALJ issued an unfavorable decision. (*Id.*). The Appeals Council rejected Plaintiff's request for review. Plaintiff timely filed this action for review of the decision of the ALJ's decision on June 25, 2024. (Filing No. 1).

---

[1] Frank Bisignano is the current Commissioner and is automatically substituted as the defendant in this matter pursuant to Fed. R. Civ. P. 25(d).

FACTUAL BACKGROUND AND MEDICAL EVIDENCE

Plaintiff was born on October 25, 1978, and was 41 years old on her alleged disability onset date. Plaintiff has a limited education, attending high school into the 12th grade, but did not graduate and has not obtained a GED. Plaintiff has three minor children and is not married. Plaintiff's dad and boyfriend help her take care of her children. (Filing No. 7-2 at pp. 43, 51; Tr. 42, 50). Plaintiff's claimed disability onset date is March 2, 2020, when a school bus she was driving in the course and scope of her employment was hit on the driver's side by a car running a red light. (Filing No. 7-2 at p. 22; Tr. 21, 69, 355).

i.     Emergency Room Visits

Plaintiff's motor vehicle accident ("MVA") occurred on March 2, 2020. She went to the emergency room ("ER") the following day for back pain, headaches, tingling in her knee, and difficulty rotating her neck. Plaintiff's vitals on this date include a recorded height of 5'11 and a weight of 313lb (BMI 43.75). (Tr. 372, 380). A CT scan of her brain was unremarkable. (Tr. 377). By March 13, 2020, Plaintiff reported she was going to the chiropractor, and her soreness was slowly improving, but she was having nightmares and the pain in her head is worse with movement. (Tr. 355). Plaintiff was assessed with post-concussion syndrome and PTSD. (Tr. 357). On this same date, Plaintiff was referred to Michelle Christensen, PA-C, due to anxiety. (Tr. 358).

On March 22, 2021, Plaintiff went to the ER complaining of memory issues and difficulty with speaking, and over one year of nearly daily headaches. The physical exam did not indicate focal deficits, and Plaintiff was able to communicate without difficulty. The ER physician discussed her complaints could have multiple causes, including combination of PTSD, stress, lack of sleep or other stressors in addition to other potential medical pathologies such as a demyelinating disorder such as M.S. (Tr. 377, 382). A CT of her brain on this date was unremarkable. (Tr. 383).

ii.     Nebraska Medical Center Medical Records June 4, 202,1 to September 13, 2021

Plaintiff saw her primary care provider, Dr. Jenna Wong, DO, on June 4, 2021, to discuss ongoing daily headaches from the MVA. Plaintiff reported her "headache is currently mild though seems to worsen with increased stress and concentration." (Tr. 427). Plaintiff's physical exam contained normal findings without focal deficit, but Plaintiff was noted as "tearful." Her recorded weight on this date was 307lbs (BMI 42.82). (Tr. 428). Dr. Wong determined the symptoms were "suggestive of chronic tension headaches and are relieved with ibuprofen" and believed depression was "likely" playing a role. Dr. Wong collected labs and referred Plaintiff to physical therapy for

2

evaluation and treatment. Plaintiff's B12 level was slightly elevated but her labs were otherwise unremarkable. Dr. Wong started Plaintiff on amitriptyline for her headaches. (Tr. 428).

On June 15, 2021, Plaintiff called Dr. Wong to report the amitriptyline was "working off and on." (Tr. 426). At Plaintiff's annual exam with Dr. Wong on July 2, 2021, Plaintiff reported "some relief with Elavil" and had "no focal neurologic deficits or abnormalities on exam." Plaintiff reported feeling generalized weakness and occasional confusion, but denied numbness, tingling, and vision changes. Dr. Wong continued to suspect Plaintiff's "headaches are at least in part secondary to stress/depression following the accident." (Tr. 425).

On July 14, 2021, Plaintiff began physical therapy with Ashley White, PT. Plaintiff reported headaches, neck pain, occasional light headedness, forgetfulness and some difficulty with saying the words since her MVA. Plaintiff also complained of weakness and generalized body aches after light to moderate physical activity. Plaintiff rated her current pain at 5/10 and 10/10 at its worst. Plaintiff reported she does not currently exercise, and she can do household activities for about 10-15 minutes before she needs to rest. (Tr. 416-417).

Plaintiff attended another physical therapy session on July 28, 2021, reporting she "tried to be a little more active this week" by going on "short walks for 2 blocks, 3x" and cooking "3 times instead of just 1." Plaintiff had rated her headache pain at 2/10 and believed it was improved from her medication. (Tr. 414). At Plaintiff's physical therapy session dated August 2, 2021, Plaintiff reported she could walk half a block before needing to rest, but rated her headache as 1/10 with increase to 6/10 with very light exercise. (Tr. 412-413). At Plaintiff's physical therapy session on August 4, 2021, Plaintiff reported the medication was helping her headaches. Plaintiff "tolerated treadmill walking well" but her headache increased after five minutes, and she had an increase in symptoms with positional changes. PT White recommended Plaintiff be "scheduled for further concussion management soon to assist with speech and ocular [symptoms]" and that she would benefit "from referral for low back pain." (Tr. 411-412). At Plaintiff's August 4 and August 16, 2021, physical therapy sessions, she reported 0/10 headache pain that went to 6/10 with light exercise, but at her August 16 session she "tolerated a full 30 minutes of exercise . . . without increase in headache, which is a big improvement." (Tr. 410). On August 18, 2021, Plaintiff's headaches were noted as improving overall, but she still had "a lot of [symptoms] with activities." (Tr. 409). At Plaintiff's August 23, 2021, session, she "had significant fatigue during buffalo treadmill test and had to terminate at 6 minutes" with increased headache that "return[ed] to

baseline with some rest." (Tr. 407). On August 30, 2021, Plaintiff "had fatigue with walking and exercising; she continues to be very deconditioned" but was "able to tolerate more activity without reproduction of headache." Plaintiff was noted to "require continued care to progress activity tolerance, motor control, strength, vestibular [symptoms], and mobility." (Tr. 406). At Plaintiff's September 1, 2021, session, she reported a 3/10 headache pain, 5/10 with exercise, but tolerated "activity well compared to prior sessions." (Tr. 39-399). At Plaintiff's September 8, 2021, session, she was "was 20 minutes late to 30 minute session" and continued to have fatigue with activities a low tolerance to cardiovascular exercises. (Tr. 393-394).

Plaintiff underwent a brain MRI on July 28, 2021, and on July 29, Dr. Wong noted Plaintiff's MRI results were largely normal but "possibly suggestive of intracranial hypertension" and referred Plaintiff to neurology for further evaluation. (Tr. 413). Autumn Nye, APRN, conducted the follow-up on August 31, 2021. (Tr. 405). Plaintiff was alert, oriented to self, location, date and situation, and her recall and memory were normal. Plaintiff was noted to have appropriate content and cadence, no dysarthria, and no word finding difficulties. Generally, the physical findings were unremarkable or normal. On this date, Plaintiff reported she had started smoking two months ago. (Tr. 399-403).

On September 1, 2021, Plaintiff was referred to Hannah Jackman, MS CCC-SLP, for a Speech-Language Pathology Consultation. (Tr. 395). After testing, Plaintiff was assessed with "mild cognitive communication deficits affecting memory, language, and high level executive function" and was given a treatment plan including functional memory tasks to perform one to two times per week for 12 weeks. (Tr. 397). These deficits were noted to persist at her September 10, 2021, session. (Tr. 392).

*iii.    Nebraska Medical Center Medical Records September 16, 2021, to November 11, 2021*

Plaintiff continued regular physical therapy sessions with Ashley White throughout this period. Plaintiff was often late to her appointments because she frequently arrived at the wrong facility, an issue White attributed to Plaintiff's mental fogginess. Plaintiff reported physical therapy had helped her improve her neck mobility and activity tolerance, and at an appointment on September 16, 2021, Plaintiff stated she was able to cook the night before and "did a little better energy wise." (Tr. 492-493, 495, 500-501). On September 22, 2021, Plaintiff arrived late and reported extreme drowsiness from her medications for headaches. (Tr. 495-496). On September 29, 2021, Plaintiff reported she was late because she was doing a lot to get the kids ready for school,

and has been doing more around the house and cooking for longer periods of time; however this is causing her to have more symptoms such as dizziness, fogginess, neck pain and sometimes headaches. She reported she "went to the gym and did an elliptical for 2 minutes and then switched to a different machine." She reported a pain rating of 0/10 headache. (Tr. 492). Notes during this time indicate Plaintiff reported fatigue and back pain, which may be "due to decreased conditioning," and warranted further examination of her lumber spine. (Tr. 484).

Plaintiff began occupational therapy ("OT") at the Nebraska Medical Center on September 17, 2021. Plaintiff reported 0/10 pain at her first session but was "very fatigued from medication that is for management of headaches and pain." The recommended OT plan was for 12-weeks to increase performance for daily routines. (Tr. 498-500). Plaintiff continued regular OT throughout this period. (Tr. 460-461, 480-481, 493-494). Plaintiff was reassessed on October 22, 2021, and demonstrated "continued difficulty with reading tasks for vertical and horizontal saccades, visual memory tasks, central/peripheral vision integration, and significantly high symptoms on the ABI Vision Questionnaire." Plaintiff "completed convergence tasks with occasional increase in symptoms, however, was able to bring them down again with rest." It was noted that "[c]ognitive tasks also appear to increase her mental fogginess" and Plaintiff was issued "a home exercise program for saccades and near far to address convergence insufficiency." (Tr. 473-475). At an OT appointment on November 10, 2021, Plaintiff reported sleep issues, double vision, and dizziness. (Tr. 460-461).

Plaintiff continued regular speech therapy with Hannah Jackman during this time period, although she was late to multiple appointments. (Tr. 497, 459, 464, 477, 485, 491). At a session on November 5, 2021, it was noted that Plaintiff was frustrated and upset, and Jackman noted more word finding issues. (Tr. 464-465). As of November 11, 2021, Plaintiff was noted to "persist[] with mild cognitive communication deficits affecting memory, language, and high level executive function." (Tr. 459).

*iv.    Nebraska Medical Center Medical Records November 17, 2021, to February 2, 2022*

Plaintiff continued regular OT during this time period, often arriving late to appointments and frequently complaining of headaches and exhaustion or fatigue. (Tr. 513-514, 517-519, 520-523, 537-540, 544-545, 574, 595). On November 17, 2021, it was noted her ABI score was "high" and that "saccades both vertical and horizontal are not within normal limits" but her [s]ymptoms continue to burden everyday activities." (Tr. 544-545).

Plaintiff continued regular speech therapy with Hannah Jackman during this time period, again arriving late to multiple appointments. (Tr. 515-517, 543, 583-584, 567-568). On December 29, 2021, Plaintiff still "demonstrated same inappropriate grammar and pauses during verbal conversation, which appeared to increase as the session progressed," and Jackson noted Plaintiff's "symptoms appear to significantly affect her language." (Tr. 516). On January 27, 2022, Plaintiff's overall cognitive score was within normal limits, but she continued to demonstrate memory deficits affecting her daily living activities. (Tr. 585).

Plaintiff continued regular physical therapy during this time. (Tr. 510-511, 526-527, 531-532, 577-579, 586, 598-599). On December 20, 2021, Plaintiff's assessment plan included "skilled physical therapy intervention for postural/ergonomic education, improving strength for core and stabilizing musculature, improving joint mobility and flexibility, gait and balance training, pain education, manual therapy and modalities as appropriate" and reviewed a plan of care and home exercise program. (Tr. 527-528). On January 10, 2022, Plaintiff stated her exercises have been "going ok," rated her pain as 3-4/10 that increases with ADLs and standing for longer than 3-5 minutes. (Tr. 510). In January 2022, at several sessions Plaintiff was noted to "lack[] the lower extremity strength to support her body in standing for prolonged periods of time" and was noted to require frequent seated rest breaks during treatment sessions due to decreased activity tolerance. (Tr. 591-593, 577-579, 598).

On December 7, 2021, Plaintiff sought care from her PCP to discuss signs of depression, reporting she was having problems with her memory and feeling distracted, but that overall she felt PT and OT were helping her symptoms improve. (Tr. 534-535). Plaintiff's height was recorded as 5'11.5" and weight at 299lbs. Plaintiff's physical examination was "benign though she does have significant tenderness to palpation at numerous muscular areas across her upper, mid and lower back." (Tr. 524-525). Plaintiff saw Dr. Wong again on January 21, 2022, for new lower back pain and episodes of chest pain. Plaintiff reported continued weakness and that she was only able to "walk half a block before stopping to rest[]" and that she needed to use a cane. Plaintiff's physical exam was unremarkable. (Tr. 589-590). On January 27, 2022, Plaintiff had a cardiology appointment for her chest pains, which were determined to be "most likely musculoskeletal." Plaintiff's weight on this date was recorded as 295lbs 3.2 oz with a height of 5'11.5. Plaintiff reported "recently smoking last year." (Tr. 582-583).

On February 1, 2022, Plaintiff saw APRN Nye for a neurology appointment for her continued headaches and memory issues. Plaintiff's physical exam was generally normal, Plaintiff was alert, and her memory and recall were normal. Plaintiff reported being an every day smoker. Plaintiff was counseled in lifestyle modifications, such as increasing aerobic exercise and tracking headaches with an app, and to follow up in three months. (Tr. 568-574).

v.    *Nebraska Medical Center Medical Records February 23, 2022, to July 21, 2022*

Plaintiff continued regular speech therapy with Hannah Jackman during this time. (Tr. 642-644, 728-729). Plaintiff also continued regular physical therapy, and her provider continued to note Plaintiff's difficulties standing for prolonged periods of time and need for frequent seated rest breaks, lower extremity weakness, and decreased activity tolerance. (Tr. 616-619, 625-641, 645-654, 662-665, 676-679, 683-703, 709-720, 723-725). On July 6, 2022, the physical therapist noted Plaintiff "continues to demonstrate very slow movement pattens with limited ROM actively, in all motions not related to a specific muscle group or dermatomal pattern" and has made "little to no progress." Plaintiff reported she "does her exercise at home and tries to keep moving." It was noted she may "benefit from Chronic Pain Management Program or a Waterbased exercise program." (Tr. 631-634).

Plaintiff followed up with Dr. Wong on February 28, 2022, for back pain. An x-ray in clinic showed "no notable abnormalities." Dr. Wong recommended an MRI for further evaluation. (Tr. 721-722). On March 11, 2022, an MRI of Plaintiff's lumbar spine showed "At L4/L5 there is a left subarticular disc protrusion potentially impinging the transiting left L5 nerve root and mildly narrowing the left L4/L5 neural foramen" and "No additional spinal canal or neuroforaminal narrowing in the lumbar spine." (Tr. 738-741). Dr. Wong noted Plaintiff's MRI results and was "concerned about [Plaintiff's continued weakness without clear etiology despite physical therapy," and referred Plaintiff for a possible EMG. (Tr. 712).

On March 25, 2022, Plaintiff saw Grant Langhofer, DO, regarding her right leg weakness. Dr. Langhofer noted "multiple rounds of imaging including MRI brain and lumbar spine without a clear etiology of her symptoms." (Tr. 703-705).

On April 29, 2022, Dr. Wong noted Plaintiff's EMG indicated bilateral carpal tunnel. Plaintiff was provided wrist splints to be used as needed. Plaintiff's height was recorded as 5'11 and weight at 300lb on this date. (Tr. 680-681). On May 27, 2022, Plaintiff followed up with Daniel Firestone, MD, for evaluation and treatment of bilateral numbness and tingling in her hands.

Dr. Firestone provided splints and discussed she may be a candidate for surgery in the future. (Tr. 656). Plaintiff followed up with Dr. Firestone again on June 24, 2022; Plaintiff noted her symptoms had been improving with nighttime splinting, but still had symptoms when lifting. (Tr. 641-642).

On May 9, 2022, Plaintiff followed up with APRN Nye regarding headaches, and a sleep study and lifestyle modifications were recommended to address ongoing symptoms. (Tr. 669-675). Plaintiff had another follow up with APRN Nye on July 19, 2022, reporting she felt like her headaches were generally well controlled on the amitriptyline, but they occur when she reads and writes and when she concentrates. (Tr. 619-625).

On May 17, 2022, Dr. Wong discussed with Plaintiff her opinion that she is capable of working despite "ongoing sequelae from her accident" because Plaintiff's "overall level of physical impairment is variable and not consistent with clear etiologies based on imaging and physical exam." (Tr. 668).

On May 18, 2022, Plaintiff met with Dr. Michael Weaver, DO, to discuss the results of an "EDX" completed on April 6, 2022. Dr. Weaver noted Plaintiff "tolerated it well overall but NEE was particularly difficult and we elected to limit sampling due to comfort considerations. Overall, this largely demonstrated L CTS and was otherwise unremarkable." Plaintiff was laying in bed and was tearful at this visit. (Tr. 666-667).

On May 25, 2022, Plaintiff had a behavioral health appointment with Courtney Brennaman, MS. Plaintiff reported she had been feeling more down lately, fluctuating mood, and having difficulty adjusting and finding support post-injury. It was noted Plaintiff could benefit from resource coordination with counseling, coping skills, and social services, and recommended she follow through with psychotherapy and social work referrals. (Tr. 659-662).

On June 1, 2022, Plaintiff was diagnosed with obstructive sleep apnea after a home sleep apnea study. (Tr. 734-736).

*vi.    Nebraska Medical Center Medical Records July 21, 2021, to May 23, 2022*

Plaintiff followed up with Dr. Firestone on July 29, 2022, regarding her bilateral carpal tunnel, and reported improving symptoms. (Tr. 810-813).

At an August 15, 2022, physical therapy appointment, it was noted Plaintiff "has shown improvement in her speed of motion and gait" and "has been able to increase her general activity tolerance to a point." Plaintiff still had "specific pain related to decreased strength and endurance in the deep cervical flexor" and it was recommended Plaintiff continue physical therapy twice a

week for four weeks. (Tr. 781-784). Plaintiff continued physical therapy until it was discontinued due to lack of insurance coverage on August 22, 2022. (Tr. 777-781).

Plaintiff continued regular speech therapy. (Tr. 769-771, 773-774, 786-787, 809-810). At an appointment on August 12, 2022, Plaintiff stated her cognitive deficits seemed to have slightly improved after recently starting a depression medication. (Tr. 787). At an August 30, 2022, appointment, Plaintiff reported memory issues and concussion symptom increases when parenting her children. (Tr. 770).

On August 5, 2022, Plaintiff began regular occupational therapy related to her bilateral carpal tunnel. (Tr. 784-785, 800-801, 805-806). On August 15, 2022, Plaintiff stated she felt therapy was helping her hands, but it was noted she continues to have difficulties with "gross grasping and fine motor tasks as she has difficulties regulating how much pressure to use when gripping or pinching due to decreased sensation to the fingers." (Tr. 785).

On August 5, 2022, Plaintiff saw Dr. Ray regarding depression and continued symptoms from her March 2020 MVA. Dr. Ray started Plaintiff on Lexapro, and referred her to Dr. Jodi McQuillen, PhD, LMHP for neuropsychology for more focused therapy. Plaintiff met with Dr. McQuillen the same date, and was agreeable to begin psychotherapy and a neuropsychological evaluation. (Tr. 807-808).

Plaintiff had her initial appointment with Dr. McQuillen on August 8, 2022. Dr. McQuillen assessed Plaintiff with depression impacting her functioning across the domains of her life, and recommended compliance with prescribed psychotropic medication, utilization of legal and community resources for support, and supportive psychotherapy. (Tr. 800-805). Plaintiff continued biweekly sessions with Dr. McQuillen through May 2023 to treat and develop coping skills for depression and newly reported anxiety, which Plaintiff attributed to Lexapro. (Tr. 753-758, 766-768, 775-777, 828-831, 838-841, 851-854, 863-866, 867-870, 1472-1474, 1480-1483, 1496-1500, 1506-1510).

On August 11, 2022, Plaintiff attended an initial evaluation with John A Gajewski, PA-C, to establish psychiatric care and medication management. Plaintiff reported she had resumed smoking the previous year to help with her headaches and stress. Plaintiff's speech was observed as delayed, with increased latency of response and normal volume; her memory was mildly limited; and her cognition was grossly intact. (Tr. 788-795). Plaintiff had a follow up appointment with PA Gajewski on September 22, 2022, for psychiatric medication management. Plaintiff was started

on Effexor. (Tr. 758-764). At a session with Dr. McQuillen on October 7, 2022, Plaintiff reported the Effexor had reduced her pain and depression symptoms. Plaintiff stated she had stopped taking amitriptyline without consulting her PCP because it was "too sedating and she believes her cognitive processing speed and aphasia have slightly improved since stopping the medication." Plaintiff "reports she has been able to go to karaoke more frequently for socialization and enjoyment." (Tr. 753).

Plaintiff followed up with PA Gajewski on November 11, 2022, reporting mild improvement in depression symptoms with Effexor, but her symptoms were still noted to be "clinically impairing." Her Effexor dose was increased. (Tr. 843-849). On March 10, 2023, Plaintiff reported feeling more down and disappointed because her disability was denied, and her Effexor dose was increased. (Tr. 1458). On May 3, 2023, Plaintiff reported to PA Gajewski that the increased Effexor dose has helped give "a boost to resiliency" and a little boost to energy. (Tr. 1489-1490).

On August 9, 2022, Plaintiff was referred to Zachary Oman, DO, regarding her ongoing chest pain deemed non-cardiac. Plaintiff reported she walks around a park in her neighborhood three times per week without chest pain or shortness of breath, palpitations, lightheadedness, or dizziness. Plaintiff reported her chest pain had resolved with anti-inflammatory medications. Plaintiff was encouraged to stop smoking and to make diet modifications to lower cholesterol, and to increase her exercise regimen. (Tr. 796-799).

On September 14, 2022, Plaintiff saw Alex Beck, MD, for right foot pain that "has been going on since her MVA, but seems worse in the last few months." Dr. Beck diagnosed plantar fasciitis and prescribed heel inserts and stretching exercises. (Tr. 764-765).

On October 7, 2022, Plaintiff saw Dr. Ray and reported she was continuing to have issues with short and immediate term memory and recall; issues with standing for more than 20 minutes and sitting for more than 10 minutes; and issues with her fine motor skills. Dr. Ray diagnosed TBI and depression. (Tr. 752). Plaintiff followed up with APRN Nye on October 24, 2022, for headaches, and lifestyle modifications such as regular aerobic exercise and regular sleep patterns were suggested. (Tr. 857-863).

On November 4, 2022, Plaintiff sought treatment for abdominal symptoms and vomiting. (Tr. 854-857). An abdominal ultrasound on November 9, 2022, demonstrated mild hepatic steatosis. (Tr. 885-886). Plaintiff followed up with Dr. Ray on November 15, 2022, regarding her

10

nausea, epigastric pain, anemia, and constipation. She was started on Protonix for GERD symptoms. (Tr. 841-843). At another follow up with Dr. Ray on November 30, 2022, Plaintiff's constipation had resolved, she admitted to recently beginning to smoke ½ a pack a day, and Dr. Ray referred her to physical therapy for an evaluation due to physical deconditioning. (Tr. 836-838).

On May 2, 2023, Plaintiff was referred to aquatic physical therapy to address chronic lower back pain with headaches, non-specific lower leg pain, and generalized deconditioning. The plan included physical therapy treatment 0-2 times a week for 4-8 weeks. (Tr. 1502-1506, 1511-1514).

On May 8, 2023, Plaintiff saw Dr. Ray complaining of right leg pain, which she stated developed after she had to drive 2-hours to Des Moines for her workers compensation paperwork. Plaintiff's boyfriend stated they had been walking more, which exacerbates symptoms, and had recently started Topimax for migraine prophylaxis. Dr. Ray restricted Plaintiff's driving time to 1-hour. (Tr. 1500-1501).

On May 23, 2023, an x-ray of Plaintiff's right leg for pain demonstrated normal osseous alignment, no acute or healing fracture, and "[m]ild to moderate medial femoral tibial compartment DJD right knee. No knee joint effusion. Small dorsal calcaneal enthesophyte." (Tr. 1515).

*vii.*    *Other Medical Records*

An "incomplete" clinic note from Madonna Hospitals dated April 6, 2022, indicates Plaintiff presented for an evaluation for "walking, no dizziness, and then . . . will be on the floor." Under Social History, the note states Plaintiff reports occupation is "retired," is single, lives alone, denies tobacco usage, and in response to exercise the note reads "gym 3x a week work on balance, lifting, weights." The recorded vital signs list the patient's weight as 179.2lb and height as 64 inches. Elsewhere the note referred to Plaintiff by name and correct age and birthdate. (Filing No. 8-1 at p. 260; Tr. 612).

## OPINION EVIDENCE AND EVALUATIONS

*i.*    *Alan D. Jensen, MD*

Alan D. Jensen, MD, evaluated Plaintiff on August 13, 2020. (Tr. 363-365). Dr. Jensen noted observed Plaintiff "has been having a number of difficulties, essentially coming down to some mental status changes with regard to vocalizing her thoughts" and that she still has "a whiplash, as well as a lumbar strain, and what appears to be posttraumatic headaches." Plaintiff

stated that since the MVA, she has had "a hard time getting out the word that she was thinking of saying" or articulating words and her biparietal headaches were getting worse.  Plaintiff reported "numerous visits for the chiropractic treatment to the neck and low back and felt better immediately after the treatments, but really did not obtain any sustained relief."  Plaintiff also reported psychological issues such as nightmares and hypervigilance.  On this date, Plaintiff was noted as a "well-dressed, well-kempt, polite, cooperative lady in some distress due to the psychological component and the headache component of the injury."  (Tr. 365).  Dr. Jensen recommended epidural steroid injections following an MRI of the cervical and lumbar spine, as well as a brain MRI due to "the significant mental status changes on just gross office testing."  Dr. Jensen recommended she follow up with a neuropsychologist, Dr. Matthew Garlinghouse, for formal mental status examination and neuropsychological testing.  (Tr. 365).

ii.    *Abbey Hansen, PA-C*

Abbey Hansen, PA-C, authored a Disability Exam Medical Report on February 1, 2022. (Tr. 557).  Hansen noted Plaintiff is living with her children and father, and can bathe, dress, and undress herself.  Plaintiff does some cooking though with difficulty, as she "has to sit often and cannot prepare a whole meal without rest."  Plaintiff had worsening pain to her back and neck with the prolonged standing.  Plaintiff relies on her father and children to help her clean.  Plaintiff's recorded height was 5 ft 11.5 inches, and a weight of 296.8lbs.  Plaintiff had quit smoking eleven years ago, but reported starting again "within the last year."  Plaintiff walked into the clinic with a cane, but walked back and forth across the room without a cane.  Plaintiff had limited range of motion ("ROM") to her lumbar spine, and was unable to squat down and then stand to tandem walk.  Plaintiff could perform most of the ROM exercises, but her movements were "very slow." Hansen noted "some stuttering movements prior to many of her motions and she works to concentrate on each movement."  Plaintiff had focal neurologic deficits, her speech was somewhat slowed though clear, and although she "sometimes suffers from expressive aphasia" she did not show it at this examination "as she has been working with speech therapy on a weekly basis." Plaintiff reported still experiencing headaches on a nearly daily basis despite the medication that she is on; she has difficulty remembering things and will often begin a task then forget what she is doing; despite physical therapy she still "struggles with range of motion, going up and down stairs, and lacks overall strength and stamina" and "becomes easily fatigued and must often sit to rest." Hansen did not think Plaintiff could return to driving a school bus and questioned Plaintiff's ability

to drive herself places.  Hansen did not "think [Plaintiff] would be able to tolerate any physically demanding job."  (Tr. 559).

    *iii.*    *Dr. Erin Ray, DO*

       Dr. Ray authored a treating source statement on October 7, 2022.  (Tr. 822).  Dr. Ray's diagnoses and medical symptoms included traumatic brain injury, posttraumatic chronic headaches, chronic fatigue and pain, aphasia, difficulty concentrating, expressive and receptive language deficits, dyslexia, bilateral carpal tunnel, chronic midline back pain, depression, and fine motor skill dysfunction.  Dr. Ray's prognosis included "lifelong deficits even with rehab."  Dr. Ray's specific restrictions included: inability to stand greater than 20 minutes, fine motor skills, inability to learn new information, speech and writing impairments, concentrating longer than 75 minutes, and heavy lifting.  Dr. Ray also noted lifelong limitations in activities of daily living such as cleaning, cooking, standing, and dressing.  Dr. Ray noted lifelong limitations in short-term memory, lifting more than 5lbs, standing more than 20 minutes, fine motor skills, balance when standing and walking, and sitting straight more than 10 minutes.  (Tr. 822-823).

    *iv.*    *Matthew Garlinghouse, PhD*

       On December 7, 2022, Plaintiff underwent a neuropsychological evaluation of cognitive strengths and weaknesses in the context of MVA in 2020 and ongoing cognitive concerns at Nebraska Medicine by Dr. Garlinghouse, a clinical neuropsychologist. (Tr. 831-846).  Plaintiff was oriented to person, place and time. Her hearing and vision appeared to be adequate, her speech was "fluent but intelligible" and was "slowed at times while [she] took time to formulate her response. Rare paraphasic errors were noted."  Her "[t]hought processes were linear and goal-directed, and of normal content" and "she was cooperative with the evaluation, understood the directions provided her and performed well on formal symptom validity testing."  Plaintiff "required several breaks to smoke and manage her headache, which appeared to be a primary barrier to test completion."  (Tr. 947).  Testing indicated "Baseline cognitive function was estimated to be in the low average to average range.  Performance on embedded measures of sustained attention and effort were broadly within normal limits."  Dr. Garlinghouse noted her "performances reveal some mild weaknesses for visual memory," but "[a]ll other scores are broadly within the expected range given her baseline cognitive estimate."  Dr. Garlinghouse stated, "Her current cognitive profile reveals that this patient has not experienced a broad cognitive decline, at least for those domains that could be assessed.  There is no evidence of an area of focal impairment consistent with tissue

damage/loss due to TBI, at least for the domains assessed." Dr. Garlinghouse did find it "important to note that [Plaintiff's] performances were clearly impacted by the presence of headache, fatigue, mood and concerns for her physical pain/ wellbeing," and "given the reported mechanism of injury and unremarkable CT imaging, these factors appear to be the primary barriers to the return of [Plaintiff's] baseline level of cognitive function." (Tr. 948). Dr. Garlinghouse recommended "ongoing and aggressive management of this group of symptoms . . as improved control of headache and mood are most likely to be associated with improved cognition on a day to day basis." (Tr. 948).

     *v.*     *Jodi McQuillen, PhD, LICSW*

Jodi McQuillen, PhD, authored a mental medical opinion on July 3, 2023. (Tr. 1517). Dr. McQuillen began psychotherapy with Plaintiff on August 8, 2022, and had seen Plaintiff for twenty-two, fifty-minute appointments. Dr. McQuillen stated that in forming her opinions, she relied on Dr. Garlinghouse's neurological evaluation dated December 7, 2022, and her own initial assessment for psychotherapy dated August 8, 2022. Dr. McQuillen opined Plaintiff's underlying conditions of traumatic brain injury and cognitive deficit cannot be cured, noting Plaintiff has plateaued in her treatment and "further progress is unlikely due to TBI's impact on her cognition." Dr. McQuillen believed Plaintiff "will always need prompting, reminding, and cueing." Plaintiff's medications included Lexapro, Effexor, and Topamax, which have side effects of sedation, fatigue, lethargy, and increased brain fog.

Dr. McQuillen's prognosis was "poor due to permanent nature of TBI with resulting cognitive deficits." (Tr. 1517). Dr. McQuillen rated Plaintiff as "unable to meet competitive standards" or "no useful ability to function" in several categories of mental abilities and aptitudes needed to do unskilled work, including abilities to remember and carry out work procedures and even short, simple instructions, perform at a consistent pace, deal with normal work stress, complete a normal work day, and maintain regular attendance. Dr. McQuillen stated Plaintiff has demonstrated these marked limitations consistently during treatment and with her other medical providers, and although Plaintiff "desperately wants" to reach her prior level of functioning, she has been unable to return to her level of functioning despite her efforts and seeing multiple specialists. Dr. McQuillen also opined that Plaintiff's intellectual functioning was limited per Dr. Garlinghouse's neurological evaluation. Plaintiff consistently experiences memory, problem solving, and language deficits that cause emotional distress, and her concentration and ability to

learn complex material is also impaired. (Tr. 1519-1520). Dr. McQuillen indicated Plaintiff's migraines are exacerbated when Plaintiff needs to concentrate more than 20 minutes, which was also noted by occupational and physical therapy notes. Dr. McQuillen opined Plaintiff's impairments would cause her to be absent from work more than four days a month. (Tr. 1521).

  *vi.*   *State Agency Consultants*

  On February 22, 2022, at the initial level, non-examining agency medical consultant, Alexandra Suslow-Geditz, MD, reviewed the medical record and opined Plaintiff had the capacity to work with few physical limitations. Dr. Suslow-Geditz stated, "There is objective evidence regarding [Plaintiff's] cognitive allegations" but the intense level of severity reported by Plaintiff was not corroborated by medical findings, which essentially were normal. (Tr. 70-73).

  On February 22, 2022, at the initial level, Rebecca Braymen, Ph.D., a nonexamining agency psychological consultant, provided opinions concerning Plaintiff's mental limitations. Dr. Braymen noted Plaintiff's statements she "has an increase in headache severity when intense concentration is required" but her therapy notes indicate improvement is evidenced, and Plaintiff "remains capable of following general instructions, maintaining a schedule and routine, making decisions, and working around and in coordination with others." (Tr. 73-74).

  On January 19, 2023, at the reconsideration level, Lee Branham, Ph.D., a nonexamining agency psychological consultant, provided opinions concerning Plaintiff's mental limitations. On reconsideration, Plaintiff alleges that her cognitive symptoms were worsening. Since the previous review, Dr. Branham considered additional Occupational Therapy records showing an adjustment disorder with depression and a history of concussion, and a speech and language evaluation from Munroe Meyer dated June 2022 showing mild to moderate deficits. (Tr. 90-91). Dr. Branham noted Plaintiff's neuropsychological evaluation dated December 2022 shows average to low average scores, and a diagnosis of cognitive changes. Dr. Branham noted diagnosis of persistent depressive disorder and a history of PTSD, but did not believe Plaintiff's emotional or cognitive symptoms are at a level of severity that would prevent all work. (Tr. 91). Dr. Branham opined that even with her cognitive changes, aphasia and mild depression, Plaintiff retained the ability to handle simple instructions, sustain attention/concentration well enough to carry out simple instructions, manage social interactions that are not highly intense or conflictual, and deal with changes that are relatively well-planned and clearly explained. (Tr. 97-99).

On January 23, 2023, at the reconsideration level, Jerry W. Tanner, M.D., a nonexamining agency medical consultant, provided opinions concerning Plaintiff's physical limitations. (TR 98-99). Dr. Tanner largely found Plaintiff had few physical limitations aside from avoiding concentrated exposure to fumes due to migraines, (Tr. 96), and some lifting and postural limitations, (Tr. 96-97).

## THE ALJ HEARING

Plaintiff, represented by counsel, appeared by video conference at the hearing before the ALJ on July 6, 2023. Plaintiff testified she had worked as a school bus driver for eight years, but had not worked since she was in a motor vehicle accident while driving a school bus in March 2020. Plaintiff testified she no longer had the CDL license required for that position because she had to "take a level 2 class," but was not able to because she had "a hard time with concentration and reading[.]" (Filing No. 7-2 at p. 45; Tr. 44). Prior to working as a school bus driver, Plaintiff worked as a manager of a daycare, as a store manager at The Salvation Army for a few years, as a store manager at a theater, a supervisor or in-stock specialist at Sears, and at a thrift store. (*Id.* at pp. 46-48; Tr. 45-47).

Plaintiff testified she feels unable to work because she has "massive headaches" that are worse when she is "trying to concentrate." When she is writing, she "can forget how to spell some of the smallest words," and when she is reading, particularly out loud, the wrong words will come out. She cannot stand for a long time because of her lower back pain and feet aches. Plaintiff testified she has difficulty lifting things. Plaintiff testified she has pain every day, which primarily feels like a "constant knot in my lower back" that provides a sharp pain if she tries to bend or do the dishes, and that her feet ache constantly. Plaintiff testified it has been "hard for [her] to swallow because I know how active I was." (*Id.* at pp. 49-50; Tr. 48-49).

Plaintiff testified she takes medications but has not noticed side effects. Plaintiff testifies she has had a headache "[e]very day since the accident," but that they are more manageable now with medication. Plaintiff testified that, even with medication, concentrating "triggers" her headaches, which she describes as a "pounding" in her brain that moves around to different parts of her head. (Filing No. 7-2 at pp. 51-52; Tr. 49-51). Plaintiff never had headache issues before the accident. (Filing No. 7-2 at p. 51; Tr. 50). Plaintiff testified "communicating" also triggers her headaches, and she has trouble using the correct words when speaking to someone. Plaintiff

testified she is able to start her normal daily activities but is unable to finish "because of the pain that I get," and has to sit down and take a break while cooking.  Plaintiff can shower but has difficulty dressing herself.  (Filing No. 7-2 at pp. 52-53; Tr. 51-52).  Plaintiff testified she "tries" to do housework, but her dad, boyfriend, or children have to help her clean.  (Filing No. 7-2 at pp. 53-54; Tr. 52-53).  Plaintiff testified she "used to love" karaoke and dancing, and although she still tries to participate, she cannot dance without pain and "messes up" the lyrics when reading them and trying to sing.  Plaintiff testified she pays bills on the phone, sometimes drives her son to work, "do[es] the exercise that they told me to do," and does water therapy, which helps.  Plaintiff used to garden, but testified she cannot anymore.  (Filing No. 7-2 at pp. 54-55; Tr. 53-54).

Plaintiff testified lifting seven pounds "is super heavy," she cannot sit for extended periods of time, can only stand for "maybe 20 or 30 minutes before my feet ache[]," and is "getting a little better with walking" but can only walk "about eight to ten minutes" before needing to stop.  Plaintiff walks by either using a cane or leaning on her boyfriend.  (Filing No. 7-2 at pp. 55-56; Tr. 54-55).

Plaintiff testified her depression is a "different type of pain" because she "was always the person to depend on" but now has to "depend on other people."  She used to always work and was the main provider for her children, but cannot do so anymore.  She also experiences fatigue and feels like she "worked for a whole day" after doing a small task.  (Filing No. 7-2 at p. 58; Tr. 57).  Plaintiff also testified she now has more "problems" with her emotions, has difficulty remembering instructions, and has to take frequent breaks or could not finish a task like sweeping her small living room due to back pain and fatigue.  (Filing No. 7-2 at pp. 60-61; Tr. 59-60).

An impartial vocational expert ("VE"), Theresa Wolford, testified at the administrative hearing.  The VE classified Plaintiff's past work as a "composite job" of a daycare center director, driver, and working daycare worker, a retail manager, and a composite job as a stores laborer and warehouse supervisor, ranging from light to medium physical capacity.  (Filing No. 7-2 at pp. 62-63; Tr. 61-62).  The ALJ presented the following hypothetical to the vocational expert:

> Let's assume a hypothetical individual who is the same age, with the same vocational and educational background as the Claimant. Let's assume further the hypothetical individual is limited to the light exertional level of work, and with further nonexertional limitations, physically. The climbing of ramps and stairs, balancing, stooping, bending at the waist, kneeling, crouching, bending at the knees must be limited to occasionally, while the climb of ladders, ropes or scaffolds must be entirely precluded from work duties as assigned.
> Within the assigned work setting, there must be no exposure to concentrated

vibration or workplace hazards, such as unprotected heights and moving machinery. Fine manipulation must be limited to frequently, bilaterally. The assigned work must be limited to simple, detailed but not complex tasks, which do not require a specific production rate such as required by assembly line or hourly quota work. The assigned tasks may require frequent interact with supervisors and coworkers, but only occasional interact with the public. The assigned work tasks must be performed in a routine work setting, with only occasional change to that setting.

(Filing No. 7-2 at pp. 63-64; Tr. 62-63).  The VE testified such individual could not perform Plaintiff's past work, but could work the following light physical capacity jobs: cleaner, housekeeping, DOT Code 323.687 014, SVP: 2; routing clerk, DOT Code 222.687-022, SVP: 2; and folding machine operator, DOT Code 208.685 014, SVP: 2; all of which exist in significant numbers in the national economy.  If the hypothetical individual was reduced in exertional level to sedentary, the VE testified such individual could not perform Plaintiff's past work, but could work the following sedentary jobs: final assembler, DOT Code 713.687 018, SVP: 2; document preparer, DOT Code 249.587 018, SVP: 2; and implant polisher, DOT Code 713.687-034, SVP: 2, all of which exist in significant numbers in the national economy.  (Filing No. 7-2 at pp. 64-65; Tr. 63-64).

In response to counsel's cross-examination, the VE testified that the above hypothetical individuals could not maintain competitive employment if the individual could only perform simple instructions less than occasionally; needed to break for 20 minutes every hour; if the individual was off task more than 16% of the day; or if the individual missed more than three days of work a month.  (Filing No. 7-2 at pp. 65-66; Tr. 64-65).

## THE ALJ's DECISION

The ALJ evaluated Plaintiff's claim using the "five-step" sequential analysis prescribed by the Social Security Regulations.[2]  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).

---

[2] The Social Security Administration uses a five-step process to determine whether a claimant is disabled:

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 2, 2020, the alleged onset date. (Filing No. 7-2 at p. 17; Tr. 16). At step two, the ALJ found Plaintiff the following severe impairments: 1) migraine headaches; 2) post concussive syndrome; 3) carpal tunnel syndrome; and 4) a mental impairment variously diagnosed as neurocognitive disorder, depressive disorder, and post-traumatic stress disorder (PTSD); and non-severe impairments of obstructive sleep apnea, obesity, hypertension, mild hepatic steatosis, and gastroesophageal reflux disease (GERD). (Filing No. 7-2 at p. 18; Tr. 17).

At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ considered migraine headaches under listing 11.02(B) and (D) for dyscognitive seizures, and found the medical evidence "does not document with detailed descriptions events occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment; or occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment" and a "marked limitation" in 1) physical functioning; 2) understanding, remembering, or applying information; 3) interacting with others; 4) concentrating, persisting, or maintaining pace; or 5) adapting or managing oneself. (Filing No. 7-2 at pp. 18-19; Tr. 17-18).

The ALJ considered the "post concussive syndrome in regard to listings in section 11.00, including 11.18, *Traumatic Brain Injury*" and found it did not meet or medically equal listing 11.18 because the evidence does not describe either A) disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the injury; or B) marked limitation in physical functioning, and in one of the following areas of mental functioning, persisting for at least 3 consecutive months after the injury: 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; or 4) adapting or managing oneself. (Filing No. 7-2 at p. 19; Tr.

---

prove he lacks the RFC to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)).

18). The ALJ also found the evidence did not establish Plaintiff's carpal tunnel syndrome met or medically equaled any listing in section 11.00, Neurological Disorders.

The ALJ further found Plaintiff's mental impairments did not meet or medically equal the criteria of listings 12.02, 12.04, and 12.15. The ALJ first considered whether the "paragraph B" criteria were satisfied, that is, whether the mental impairment resulted in one extreme limitation or two marked limitations in a broad area of functioning, and found these criteria were not satisfied. The ALJ found that consistent with the conclusion of the State agency consultant at redetermination, Plaintiff has a "moderate" limitation in understanding, remembering or applying information because Plaintiff had mildly impaired memory when she was evaluated in August 2022, but "establishes intact recent and remote memory at other visits." The ALJ observed that the medical evidence, including Plaintiff's mental status reports, "generally established no serious deficits in long or short term memory or insight, and judgment," Plaintiff "was able to provide good health histories to practitioners," and reported that "she drives, shops in stores, and handles money." (Filing No. 7-2 at pp. 19-20; Tr. 18-19).

The ALJ also found that consistent with the conclusion of the State agency consultant at redetermination, Plaintiff has a "moderate" limitation in interacting with others because although Plaintiff's mental impairment would "reasonably cause limitations in this area," Plaintiff "reported getting along with people and spend[ing] time with others in person, on the phone, and by video chat," and told a provider in October 2022 she was attending karaoke. (Filing No. 7-2 at p. 20; Tr. 19). The ALJ further found that consistent with the conclusion of the State agency consultant at redetermination, Plaintiff had a "moderate" limitation in concentrating, persisting or maintaining pace. The ALJ noted Plaintiff's impaired attention and concentration at a visit in October 2022, her attention and concentration were assessed as intact at other visits. Plaintiff drives, shops in stores, and handles money, and the consultative examiner described Plaintiff as "calm, cooperative, and conversational during the exam with no tangential thinking or flight of ideas." (*Id.*).

The ALJ additionally found that consistent with the conclusion of the State agency consultant at redetermination, Plaintiff had a "moderate" limitation in adapting or managing oneself. The ALJ observed Plaintiff "did not usually complain about serious problems with adaptation and managing herself" and her treating practitioners observed Plaintiff generally had "no deficiencies in hygiene and wore appropriate attire." The ALJ also stated "[t]he evidence establishes [Plaintiff] drives, enjoys karaoke, and goes to the gym, and there is no evidence

establishing a serious problem as to being aware of normal hazards or taking appropriate precautions as necessary," and was also able to handle the mental demands of parenting with some stress. (*Id.*).

The ALJ also considered whether the "paragraph C" criteria were satisfied, and concluded they were not. The ALJ found Plaintiff's symptoms do not satisfy the criteria of listing 12.02(C), 12.04(C), or 12.15(C) because she did not "have a medically documented history of the existence of a disorder over a period of at least 2 years, with evidence of both: 1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [Plaintiff's] mental disorder" and "2) marginal adjustment, that is, . . . minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life." (*Id.*).

After consideration of the entire record, the ALJ found Plaintiff had the residual functioning capacity ("RFC")[3] to

> perform the light exertional level of work as defined in 20 CFR 404.1567(b) and 416.967(b) with further nonexertional limitations. Specifically, the climbing of ramps and stairs, balancing, stooping (bending at the waist), kneeling, crouching (bending at the knees), and crawling must be limited to occasionally while the climbing of ladders, ladders, ropes, or scaffolds must be entirely precluded from work duties as assigned. Within the assigned work setting there must be no exposure to concentrated vibration or workplace hazards, such as unprotected heights and moving machinery. Fine manipulation must be limited to frequently bilaterally. The assigned work must be limited to simple, detailed but not complex tasks which do not require a specific product rate, such as required by assembly line or hourly quota work and require only the level of judgment necessary to make simple work related decisions. The assigned tasks may require frequent interaction with supervisors and coworkers, but only occasional interaction with the public. The assigned work tasks must be performed in a routine work setting with only occasional change to that setting.

(Filing No. 7-2 at p. 21; Tr. 20). In determining Plaintiff's RFC, the ALJ stated she "considered all symptoms and the extent to which these symptoms reasonably may be accepted as consistent with the objective medical evidence and other evidence" and "considered the medical opinions and prior administrative medical findings[.]"

---

[3] "'Residual functional capacity' is 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

The ALJ followed a two-step process when considering Plaintiff's symptoms. First, she determined whether there is an underlying medically determinable physical or mental impairment that reasonably might be expected to produce the pain or other symptoms. Second, she evaluated the intensity, persistence, and limiting effects of these symptoms to determine the extent to which they limit Plaintiff's RFC to engage in work related activities. After consideration of the evidence, the ALJ found Plaintiff's medically determinable impairments reasonably might be expected to cause her alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Filing No. 7-2 at pp. 21-22; Tr. 20-21).

Plaintiff initially alleged disability due to brain injury, lower back pain, and "neck," and reported the headaches she experienced worsened when she did things, and further reported headache medications cause her to be tired all the time, caused to be unable to lift more than 10 to 15 pounds, and to frequently lose focus. Plaintiff reported the level of her pain increased the more she tried to concentrate, and that headaches were caused by reading, writing, concentrating, neck movement, stress, and depression. The ALJ found Plaintiff's statements about her symptoms were "inconsistent" because although Plaintiff's impairments are severe, the record "also reflects many unremarkable findings which establish significant functional ability." (Filing No. 7-2 at pp. 21-22; Tr. 20-21).

The ALJ discussed that the evidence establishes Plaintiff was in a motor vehicle accident March 2, 2020, when the bus she was driving was hit on the driver side by a car; a CT at the emergency department the following day was unremarkable. Another CT the following year in March 2021, showed no acute intracranial abnormality. Eleven days after the accident, Michelle Christensen, PA-C saw Plaintiff for "a pain in her brain" with nightmares and head pain, which was reported as being worse with movement. Plaintiff also reported memory change after the accident, but that she was improving "a little with chiropractic care." Christensen assessed headache, neck pain, post concussion syndrome, and PTSD. At a mental status exam the same day, Plaintiff presented with anxious attitude but normal psychomotor behavior, anxious mood with congruent affect, normal rate of speech, logical thought process, normal thought content, no impairment in cognition, fully oriented, normal judgment with good insight, and normal perception. Marie Desmoineaux, LIMHP, LMHP assessed an acute stress disorder.

22

The ALJ noted Alan D. Jensen, MD's evaluation of Plaintiff in August 2020, in which he found Plaintiff had limited lumbar spine range of motion with symmetric muscle strength, impaired memory, and while slow, was accurate with calculations.  Dr. Jensen assessed mental status changes consistent with a mild traumatic brain injury, which he concluded sounded like the previously diagnosed concussion, cervical strain, lumbar strain, and post traumatic headaches, and recommended injections to be administered after an MRI.  A lumbar spine MRI in March 2022 showed a left subarticular disc protrusion at L4-5 potentially impinging the transiting left L5 nerve root and mildly narrowing the left L4-5 neural foramen, with no additional spinal canal or neuroforaminal narrowing in the lumbar spine.  (Filing No. 7-2 at p. 22; Tr. 21).  Cervical spine x-rays in August 2021 showed mild arthritis and possible neck spasms, but at the August 2021 neurological exam, Plaintiff was described as in no acute distress, had appropriate mood, no evidence of word finding difficulties, evidence of pain with neck movements, 5/5 strength, alert and fully oriented, normal recall and memory, strong neck muscles, intact facial sensation to light touch, normal physiologic gait with normal stepping and good and stable turns, and normal deep tendon reflexes.  The ALJ discussed that at a January 2022 physical therapy visit, there was evidence of decreased mobility with a stiff legged gait, external rotation of the feet, decreased rotation through the spine, and positive bilateral straight leg raising test.

In February 2022, Abbey Hansen, PA-C, conducted an internal medicine consultative examination of Plaintiff.  At this consultation, Plaintiff reported headaches, and neck and back pain, and was documented as 5'11.5" tall and weighed 296.8 pounds, equivalent to a BMI of 40.8.  Hansen noted Plaintiff walked into the clinic with a cane but was able to walk across the room without it.  Plaintiff was unable to squat then stand to tandem walk; her movements were very slow but she was able to perform most of the range of motion exercises; she had stuttering movements prior to many of her motions and she worked to concentrate on each movement, no focal neurological deficits, speech was somewhat slowed but clear, and there was no expressive aphasia at the exam.  A lumbosacral x-ray done for the consultative examination showed no findings of significant acute pathologic process.

The ALJ also took note of Plaintiff's April 2022 medical note where she reported walking with no dizziness but then would "be on the floor."  The ALJ noted Plaintiff "was going to the gym three times a week to work on balance and was lifting weights."  The ALJ went on to observe Plaintiff had been routinely attending physical therapy and had reported to neurology the therapy

was beneficial. The ALJ stated the evidence shows Plaintiff's "headaches have been more occasional than chronic" and were manageable with medications. (Filing No. 7-2 at p. 23; Tr. 22).

Daniel E. Firestone, MD wrote in May 2022 an electromyography study was consistent with mild bilateral carpal tunnel syndrome and bilateral wrist splints were provided. Plaintiff reported she was not interested in surgery and reported the symptoms were improving with the use of the splints. Plaintiff described numbness and tingling with occasional weakness, and the physical examination showed Plaintiff had intact pulses and sensation bilaterally, and strength was generally normal aside from some weakness with resisted APB testing. Plaintiff had ultrasound treatment to the bilateral wrists in August 2022 for the diagnosed bilateral carpal tunnel, and she reported wearing prefabricated wrist cock up orthosis with compression gloves more frequently. (Filing No. 7-2 at p. 23; Tr. 22).

The ALJ noted during a speech language therapy session in September 2021, Plaintiff performed all tasks with 90 to 95 percent accuracy; recalled ten of eleven steps to a recipe she cooked before sustaining the concussion, and although she exhibited some difficulty with word retrieval and spelling during the task, she was able to self-correct and complete the task, albeit requiring some additional time. By November 2021, Plaintiff was able to alternate between memory and problem solving tasks without difficulty, and alternate attention between tasks with minimal cues in a distracting environment; minimal to mild cognitive deficits affecting memory and language were noted. Plaintiff was assessed with mild cognitive communication deficits affecting memory, language with high level executive functioning. (Filing No. 7-2 at p. 24; Tr. 23).

The ALJ noted that Jodi McQuillen, PhD, LMHP examined Plaintiff in October 2022. Plaintiff reported being "less tearful" after have some reduction of nerve pain with Effexor. Examination showed evidence of slow behavior with cooperative and polite attitude, euthymic mood with flat affect, logical and goal directed thought processes, intact associations and thought blocking. Plaintiff's speech was noted as delayed but was normal in rate, rhythm, and volume. Dr. McQuillen described Plaintiff as fully oriented with intact recent and remote memory, but with evidence of impaired attention and concentration and the doctor noted good insight and good to fair judgment. Dr. McQuillen diagnosed adjustment disorder with anxiety and a persistent depressive disorder. (Filing No. 7-2 at p. 24; Tr. 23).

The ALJ also discussed neuropsychologist Matthew A. Garlinghouse, PhD's examination of Plaintiff in December 2022 to assess Plaintiff's residual attention, concentration, working memory, processing speed and mental flexibility, verbal reasoning, visual reasoning, verbal memory, and visual memory. On examination, Dr. Garlinghouse described Plaintiff as "cooperative with fluent and intelligible, but with somewhat slowed speech at times and noted rare paraphasia errors." He observed Plaintiff's thought process was linear, goal directed, and of normal content. Dr. Garlinghouse noted Plaintiff had required several breaks during testing to smoke and manage a headache, which was the main barrier to task completion leading to abbreviated testing. Plaintiff's scores all fell within the expected range considering Plaintiff's baseline cognitive estimate, except for mild weaknesses in visual memory. Dr. Garlinghouse concluded Plaintiff had not experienced a broad cognitive decline for the assessed domains and further determined there was no evidence of an area of focal impairment consistent with tissue damage or loss due to traumatic brain injury for the assessed domains, and that Plaintiff's reported symptoms of headaches, fatigue, mood, and concern for physical pain/wellbeing appeared to be the primary barriers preventing her from returning to cognitive baseline. (Filing No. 7-2 at p. 24; Tr. 23).

The ALJ stated she "fully considered the medical opinions and prior administrative medical findings in this decision." At the initial level, medical consultant Alexandra Suslow-Geditz, MD determined Plaintiff's migraines and traumatic brain injury were severe impairments, and while these resulted in no exertional limitations these impairments would require avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. The ALJ also noted psychological consultant Rebecca Braymen, PhD, determined Plaintiff's trauma and stressor related disorder, as established by the evidence was a severe impairment due to this disorder causing moderate limitations in understanding, remembering, or applying information; mild limitations in interacting with others; moderate limitations concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself. However, the ALJ noted that the Disability Determination Explanation erroneously listed the mental impairment as nonsevere. The ALJ noted Dr. Braymen's conclusion Plaintiff would be capable of comprehending, and remembering at least simple instructions, following general instructions, maintaining a schedule and routine, making decisions, and working around and in coordination with others.

The ALJ found the above opinions of Drs. Suslow-Geditz and Braymen were not persuasive because they "were not supported by the evidence they reviewed" and were "inconsistent with the

overall evidence which establishes abnormal physical and mental status examinations which warrant the assessment of greater limitations" in Plaintiff's RFC. The ALJ specifically considered the records of Erin Ray, DO, who described Plaintiff as very tearful at an August 2022 exam and noted Plaintiff took a while to speak and finish sentences and sometimes forgot words. The above opinions were also not consistent with the ongoing treatment for migraine headaches and carpal tunnel syndrome, which included ultrasound treatment and wrist orthosis. Finally, the ALJ noted the evidence does not support the need to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc., and this limitation was not adopted upon reconsideration. (Filing No. 7-2 at p. 25; Tr. 24).

The ALJ discussed that at reconsideration, medical consultant Jerry W. Tanner, MD additionally identified obesity as severe, and carpal tunnel syndrome, gastrointestinal disorder, and sleep-related breathing disorders as not severe impairments. Dr. Tanner determined Plaintiff was able to lift and/or carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; sit about 6 hours in an 8 hour workday; never climb ladders, ropes, or scaffolds but perform all other postural activities occasionally. Dr. Tanner also determined Plaintiff should avoid concentrated exposure to vibration and even moderate exposure to hazards. The ALJ found Dr. Tanner's opinions were "generally persuasive by some explanation and support in the evidence the doctor reviewed but the overall evidence support limitations for carpal tunnel syndrome based on abnormal Tinel findings as well as treatment for carpal tunnel syndrome including ultrasound and wrist orthosis." The ALJ also found evidence of continued migraine headaches supports further environmental limitation. (Filing No. 7-2 at p. 25; Tr. 24).

The ALJ discussed that the psychological consultant at reconsideration, Lee Branham, PhD, identified additional severe impairments including neurocognitive and depressive disorders, which he concluded were reflected by the moderate limitations in the four "paragraph B" criteria. Dr. Branham found Plaintiff would be able to handle simple instructions; sustain attention/concentration well enough to carry out simple instructions; manage social interactions, which are not highly intense or conflictual; handle public, peer, and supervisor interactions, which also are not highly intense or conflictual; and deal with relatively well planned and clearly explained changes. The ALJ found these findings persuasive because they were "explained, supported by evidence the doctor reviewed, and consistent with the overall evidence, including evidence reflecting [Plaintiff] appearing very tearful at an August 2022 exam and taking a while to

26

speak and finish sentences, and forgetting words." However, the ALJ found Plaintiff would be able to perform detailed work based on testing and the conclusion of neuropsychologist Dr. Garlinghouse, who noted Plaintiff experienced no broad cognitive decline for the assessed domains and that there was no evidence of an area of focal impairment consistent with tissue damage or loss due to traumatic brain injury for the assessed domains. (Filing No. 7-2 at p. 26; Tr. 25).

The ALJ found consultative examiner, PA-C Hansen, "not qualified to determine the residual functional ability of [Plaintiff] to return to her past work" as a school bus driver or otherwise tolerate a physically demanding job. To the extent Hansen did render a medical opinion, the ALJ found it was unpersuasive because the opinion is not consistent with the overall evidence, which the ALJ found demonstrates Plaintiff has the RFC to perform a range of light exertional level work. The light exertional level of work is supported by objective findings in the record including findings of normal gait, 5/5 strength, and full range of motion, with the Claimant's ability to drive, go to the gym three times a week, and go to karaoke more frequently. (Filing No. 7-2 at p. 26; Tr. 25).

The ALJ found the opinions of Erin Ray, DO, one of Plaintiff's primary care physicians, "largely unpersuasive despite being explained and having some support in the findings[.]" Dr. Ray completed a form in October 2022, diagnosing traumatic brain injury; chronic headaches, post traumatic; chronic fatigue and pain; and aphasia. Dr. Ray determined Plaintiff was unable to stand more than 20 minutes and would be unable to sit for more than 10 minutes straight. Dr. Ray also noted problems with fine motor skills, an inability to learn new information, and with speech, communication, and balance when walking and standing. Dr. Ray concluded Plaintiff was unable to concentrate longer than five minutes; must avoid heavy lifting; and was unable to lift more than 5 pounds. The ALJ found Dr. Ray's assessed limitations were not supported by her own description of Plaintiff "as being in no acute distress nor are they consistent with the overall evidence including the report of going to the gym three times a week to lift weights and work on balance, or with the findings of normal or appropriate mood; normal behavior; grossly intact cognition and memory; appropriate and logical thought content; logical and goal directed thought processes; no word finding difficulties; and/or fair or normal insight and judgment." (Filing No. 7-2 at pp. 26-27; Tr. 25-26).

The ALJ also found Dr. McQuillen's opinions were not persuasive because, although they were explained in detail, they were "not well supported by the objective findings of the provider

and are not consistent with the overall evidence both of which support a significantly greater ability to function." Dr. McQuillen completed a mental medical opinion form in July 2023 and found Plaintiff was unable to meet competitive standards or had no useful ability to function in most areas of mental occupational functioning, including in remembering work like procedures; understanding and remembering very short and simple instructions; maintaining attention for a two-hour period; dealing with normal work stress; and understanding, remembering, and carrying out detailed instructions. Dr. McQuillen concluded Plaintiff was limited in RFC to interact appropriately with the public; maintain socially appropriate behavior; and accept instructions and respond appropriately to criticism from supervisors. Dr. McQuillen further noted memory, problem solving, and language deficits caused intense emotional distress and that concentration and ability to learn complex material was impaired. Dr. McQuillen concluded Plaintiff would be absent from work more than 4 days per month, and also determined Plaintiff would be able to manage benefits with assistance from her father. ([Filing No. 7-2 at p. 27](); Tr. 26). The ALJ did observe there was evidence in the provider's records of limitations; Dr. McQuillen wrote in January 2023 that Plaintiff had mildly impaired attention and concentration with lethargic behavior and dysphoric mood, and that Dr. McQuillen also made some abnormal exam findings including dysphoric mood or impaired attention and concentration. However, the ALJ also found Dr. McQuillen's findings were often unremarkable, including good to fair insight and judgment; intact attention and concentration; intact recent and remote memory; logical and goal directed thought processes; and normal speech. The ALJ observed that similarly, other providers also made some abnormal findings including depressed mood and constricted affect, but also noted normal or appropriate mood; normal behavior; grossly intact cognition and memory; appropriate and logical thought content; logical and goal directed thought processes; no word finding difficulties; and/or fair or normal insight and judgment. ([Filing No. 7-2 at p. 27](); Tr. 26).

The ALJ found the residual effects of the post concussive syndrome, bilateral carpal tunnel syndrome, and migraine headaches are reflected in the light exertional level with postural and environmental limitations in the assessed RFC for Plaintiff. The residual effects of carpal tunnel syndrome are further reflected in the fine manipulation limitation and the residual effects of the migraine headaches are reflected in the hazards and mental restrictions, including limiting assigned work to simple or detailed but not complex tasks that do not require a specific product rate. The mental impairment is reflected in the RFC assessment by the limitation to simple, detailed but not

complex tasks which do not require a specific product rate, such as required by assembly line or hourly quota work, with restrictions for interaction as well as work setting. The ALJ stated she considered Social Security Ruling 19-4p in addressing the evidence in this record of migraine headaches and the limitations these caused. (Filing No. 7-2 at pp. 27-28; Tr. 26-27).

The ALJ continued that the RFC is supported by the overall evidence of record, the findings of the State agency consultants, many of the findings of the consultative examiner, and Plaintiff's ability to perform various activities including driving, dressing, undressing, and bathing herself. The ALJ noted Plaintiff's imaging of her back does document some milder changes on lumbar MRI to account for some reported pain and a neck x-ray showed mild arthritis with some possible spasms. Despite some abnormal findings that support the limitations in the above residual functional capacity, Plaintiff has been found to have 5/5 strength. Plaintiff had some right tibia tenderness in May 2023 but normal musculoskeletal range of motion with no sensory deficit. Plaintiff reported using a cane but had a normal gait at exams in July and August 2021 and July 2022. Plaintiff's carpal tunnel syndrome improved with the use of splints. Plaintiff reported in July 2022 that she was doing more housework and walking more. Despite her mental impairment, the evidence established frequent findings of normal or appropriate mood; normal behavior; grossly intact cognition and memory; appropriate and logical thought content; logical and goal directed thought processes; no word finding difficulties; and/or fair or normal insight and judgment. Plaintiff also reported in April 2022 going to the gym three times a week to work on balance and lifting weights. Plaintiff told a provider in October 2022 she had been going to karaoke more frequently for socialization and enjoyment, which demonstrates both considerable physical and mental functioning as well as an ability to manage the migraine headaches. (Filing No. 7-2 at p. 28; Tr. 27).

Consistent with the testimony of the vocational expert, the ALJ found Plaintiff was not able to perform her past relevant work as a consisting of a daycare center director, driver, and working supervisor daycare worker; a retail manager; and a composite job as a stores laborer and warehouse supervisor. (Filing No. 7-2 at p. 28; Tr. 27). Considering Plaintiff's age, education, work experience, and RFC, the ALJ found there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, specifically: housekeeping cleaner, routing clerk, folding machine operator, final assembler, document preparer, and implant polisher. (Filing No. 7-2 at p.

29; Tr. 28).  The ALJ therefore found Plaintiff was not disabled under 20 CFR 404.1520(g) and 416.920(g).

In this appeal, Plaintiff contends remand is required because (1) the ALJ erred by not fully and fairly developing the record because Plaintiff's workers' compensation file and related medical opinions were apparently omitted; (2) the ALJ did not articulate sufficient reasons for finding the treating psychologist opinions not persuasive; and (3) the ALJ did not articulate sufficient reasons for finding the primary care physician's opinions not persuasive.  (Filing No. 15).

## STANDARD OF REVIEW

After a claimant has sought review of an ALJ's decision by the Appeals Council, the claimant is entitled to judicial review of the ALJ's decision in federal district court.  *Smith v. Berryhill*, 587 U.S. 471, 475 (2019); see also 42 U.S.C. § 405(g).  Because the Appeals Council declined review, the ALJ's decision is the final decision of the Commissioner.  See *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).  On review, the district court determines "whether substantial evidence on the record as a whole supports the ALJ's decision."  *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (internal citation omitted)).  Substantial evidence is "more than a mere scintilla," and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Under the substantial evidence standard, the district court will consider "evidence that detracts from the [ALJ's] decision, as well as evidence that supports it."  *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (citing *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)).  However, the district court will not reverse an ALJ's decision "simply because some evidence supports a conclusion other than that reached by the [ALJ]."  *Id.*  (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).  The district court must also affirm the ALJ's decision "[i]f, after reviewing the record, the [district] court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings."  *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).  "'It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo.'"  *Dols*, 931 F.3d at 746 (8th Cir. 2019) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)).  Nevertheless, the court's review is "more than a search of the record for evidence

supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (internal citations omitted). The Commission's decision should only be disturbed "if it falls outside the available zone of choice." *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022) (quotation omitted).

## ANALYSIS

### I.    Development of the Record

Plaintiff first argues the ALJ erred by failing to fully develop the record. Specifically, Plaintiff's claimed disability arose out of an on-the-job motor vehicle accident; Plaintiff contends there is relevant evidence concerning her medical condition and limitations gathered for her workers' compensation claim from the accident that was not included in this record. (Filing No. 15 at p. 25). Plaintiff asserts that "to fully and fairly develop the record concerning [Plaintiff's] post-MVA limitations, the opinions of this Des Moines neurologist, as well as any missing medical or medical opinions from the workers' compensation file SSA was aware of, should have been obtained." (Filing No. 15 at p. 26).

The ALJ "bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted). The inquiry focuses on "whether [the plaintiff] was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, [courts] will not remand." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). The ALJ's duty to develop the record fairly and fully exists even where the claimant is represented by counsel. See *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985). "Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work." *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012). A claimant "bears a heavy burden in showing the record has been inadequately developed," and "must show both a failure to develop necessary evidence and unfairness or prejudice from that failure." *Combs v. Astrue*, 243 Fed. Appx. 200, 204 (8th Cir. 2007) (citing *Haley v. Massanari*, 258 F.3d 742, 749-750 (8th Cir. 2001)).

Although not binding, an ALJ may consider an opinion that was part of a workers' compensation claim. See *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000); see also 20 C.F.R. § 404.1504 (providing a "decision by any other governmental agency . . . about whether you are disabled . . . is not binding on us and is not our decision about whether you are disabled," but "we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4).").  The failure of the ALJ to procure the records from Plaintiff's workers' compensation claim may constitute reversible error if Plaintiff "provide[s] some indication that the ALJ would have decided differently if the error had not occurred." *Byes*, 687 F.3d 913, 917.

In addition to Plaintiff's disability claim, she sought workers' compensation benefits arising out of her March 2, 2020, on-the-job motor vehicle accident.  The record in this case reflects Plaintiff discussed with her treating mental health providers feelings of anxiety, stress, fatigue, and emotional distress related to her workers' compensation hearings and depositions.  (Tr. 910, 921-922, 925, 941, 1029, 1530).  On April 3, 2023, Plaintiff reported to her treating physician, Dr. Ray, that Plaintiff was required to attend a "mandatory physical exam" in Des Moines for her workers' compensation claim.  (Tr. 1468).  On April 10, 2023, Plaintiff reported to Dr. Ray that she "successfully made the trip to Des Moines to meet with a neurologist for her worker's comp[ensation] lawsuit," but that Plaintiff experienced leg and back pain from the drive.  Although Plaintiff appears to imply the workers' compensation examination itself resulted in a driving restriction—arguing this appointment "concluded in a driving restriction—limited to driving not more than one hour," Filing No. 15 at pp. 25-26, the record instead reflects Dr. Ray herself recommended a 1-hour driving limitation due to the back pain and calf pain Plaintiff reported experiencing from the drive to Des Moines for that appointment.  (Tr. 1500-1501).

Plaintiff underwent a physical examination and/or a neurologist examination as part of her workers' compensation claim on April 2023, which the ALJ would have been entitled to consider. See *Prosch*, 201 F.3d at 1014.  However, Plaintiff has not explained what the results of that examination were, or how it would have changed the outcome in this case; and in any event, the results of that examination would not have been binding on the ALJ in these proceedings.  See 20 C.F.R. § 404.1504.  Additionally, aside from the April 2023 Des Moines examination, Plaintiff has also not described what workers compensation records are missing or what those missing records

contain. While it is clear the ALJ could have considered additional workers' compensation records, Plaintiff's arguments are speculative, as she has not explained how those documents would have made a difference. See *Combs*, 243 Fed. Appx. at 204 (the plaintiff must demonstrate "both a failure to develop necessary evidence and unfairness or prejudice from that failure."). Additionally, Plaintiff has not, and cannot argue, the existing record did not contain enough evidence for the ALJ to determine Plaintiff's ability to work. See *Byes*, 687 F.3d at 916 ("Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work."). The medical records in this case are voluminous, containing more than one thousand pages of records over three years regarding Plaintiff's physical therapy, occupational therapy, speech therapy, medical treatments, and psychological treatments, as well as consultative examinations and opinions from medical and mental health providers. Plaintiff has not argued these existing records were inadequate for the ALJ to make a disability determination; she just argues more could have been added. That is insufficient for Plaintiff to meet her "heavy burden" to show the record was inadequately developed. *Combs*, 243 Fed. Appx. at 204. As such, the undersigned magistrate judge finds it was not reversable error for the ALJ to fail procure Plaintiff's workers' compensation claim files.

## II.    Evaluation of Treating Providers' Opinions

Plaintiff's second and third errors both pertain to the ALJ's evaluation of the opinions of two of Plaintiff's medical providers: Dr. McQuillen, Plaintiff's treating psychologist; and Dr. Ray, Plaintiff's primary care physician. (Filing No. 15 at p. 2).

Under the revised regulations, an ALJ does not assign specific evidentiary weight to any medical opinion and does not defer to the opinion of any medical source, including treating providers. See *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) (citing 20 C.F.R. § 404.1520c(a)). "The revised regulations direct ALJs to consider five factors when evaluating the persuasiveness of a provider's medical opinion: (1) whether it is supported by objective medical evidence and the provider's own explanations, (2) whether it is consistent with other evidence in the record, (3) the relationship the provider has with the claimant, (4) the provider's specialization, and (5) any other relevant factors." *Cropper v. Dudek*, 136 F.4th 809, 813 (8th Cir. 2025) (citing 20 C.F.R. § 404.1520c(c)(1)-(5)). "Supportability and consistency are the most important factors." *Id.* (citing § 404.1520c(a)). An ALJ "may, but [is] not required to, explain how [he or

she] considered the [remaining] factors." 20 C.F.R. § 404.1520c(b)(2); accord 20 C.F.R. § 416.920c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1); 20 C.F.R. § 416.920c(c)(1). As for consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2). Where a single medical source offers multiple opinions, the ALJ is not required to discuss each opinion individually, but instead may address all of the source's opinions "together in a single analysis." 20 C.F.R. §§ 404.1520c(b)(l), 416.920c(b)(l).

Under the revised regulations, the district court's review is limited "to whether the ALJ adequately analyzed persuasiveness, including the supportability and consistency factors, not whether [the district court] agree[s] with the ALJ's evaluation of the record evidence on those issues." *Cropper*, 136 F.4th at 814 (citing *Austin v. Kijakazi*, 52 F.4th 723, 728-30 (8th Cir. 2022); *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022)). This includes "review of whether the ALJ's reasoning is 'clear enough to allow for appropriate judicial review.'" *Id.* (quoting *Grindley v. Kijakazi*, 9 F.4th 622, 631 (8th Cir. 2021)).

### i. Dr. McQuillen

Plaintiff argues the ALJ "committed a *Bonnett* error in evaluating the opinions of the treating psychologist, Dr. McQuillen," because the ALJ "fail[ed] to address the supportability factor while finding her well-supported opinions not persuasive." (Filing No. 15 at p. 2). Plaintiff refers to an unpublished opinion, *Bonnett v. Kijakazi*, in which the Eighth Circuit Court of Appeals concluded remand was "required" because although the ALJ "adequately evaluated the supportability" of a treating physician's opinion, the ALJ "did not address whether [the treating physician's] opinion was consistent with the other evidence of record, as required by the applicable regulation." 859 F. App'x 19, 20 (8th Cir. 2021) (unpublished) (per curiam). An ALJ's "failure to comply with [the] opinion-evaluation regulation [is] legal error" requiring remand. *Id.* (citing *Lucus v. Saul*, 960 F.3d 1066, 1069-70 (8th Cir. 2020)).

Supportability and consistency "are the most important factors" to consider when determining the persuasiveness of a medical source's medical opinions and, therefore, an ALJ must explain how she considered the factors of supportability and consistency in her decision.

See 20 C.F.R. § 404.1520c(b)(2). The regulations regarding supportability explain, "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative finding(s) will be." 20 C.F.R. § 1520c(c)(1). In articulating how the ALJ considered the supportability factor, the ALJ may note that the physician's own treatment notes do not support the physician's opinion, that the physician did not consider certain evidence or did not examine the claimant, or did or did not provide a detailed explanation for opinion. See *Starman v. Kijakazi*, No. 2:20-CV-00035-SRC, 2021 WL 4459729, at *4 (E.D. Mo. Sept. 29, 2021) (collecting cases). "The ALJ's brevity is not reversible error." *Grindley v. Kijakazi*, 9 F.4th 622, 631 (8th Cir. 2021).

Plaintiff asserts that in finding Dr. McQuillen's opinions not persuasive, the ALJ "fail[ed] to discuss any of the support Dr. McQuillen offered for her opinions." (Filing No. 15 at p. 28). In particular, Dr. McQuillen specifically relied on the neuropsychological evaluation authored by Dr. Matthew Garlinghouse as supporting cognitive limitations, but the ALJ did not "discuss Dr. Garlinghouse's opinions at all[.]" (Filing No. 15 at p. 28). Plaintiff contends this failure was harmful because "Dr. McQuillen's opinions are more limiting than the ALJ's RFC determination and likely disabling," and asserts the supportability factor required the ALJ "to evaluate her explanations and the objective medical evidence she provided." (*Id.*).

In this case, in discussing Dr. McQuillen's opinions, the ALJ found they were not persuasive because, although they were explained in detail, they were "not well supported by the objective findings of the provider and are not consistent with the overall evidence both of which support a significantly greater ability to function." The ALJ observed there was evidence in the provider's records of limitations; Dr. McQuillen wrote in January 2023 that Plaintiff had mildly impaired attention and concentration with lethargic behavior and dysphoric mood, and that Dr. McQuillen also made some abnormal exam findings including dysphoric mood or impaired attention and concentration. However, the ALJ also observed Dr. McQuillen's findings were often unremarkable, including good to fair insight and judgment; intact attention and concentration; intact recent and remote memory; logical and goal directed thought processes; and normal speech. The ALJ observed that similarly other providers also made some abnormal findings including depressed mood and constricted affect, but also noted normal or appropriate mood; normal behavior; grossly intact cognition and memory; appropriate and logical thought content; logical

and goal directed thought processes; no word finding difficulties; and/or fair or normal insight and judgment. And while not specifically addressed in the ALJ's discussion of Dr. McQuillen's opinions, the ALJ did discuss Dr. Garlinghouse's testing and conclusions elsewhere in her opinion. The ALJ discussed that following Dr. Garlinghouse's December 2022 examination of Plaintiff, he "concluded the test results revealed mild weaknesses in visual memory, while all other scores fell within the expected range considering the baseline cognitive estimate of [Plaintiff]." The ALJ also observed Dr. Garlinghouse concluded [Plaintiff] had not experienced a broad cognitive decline for the assessed domains and further determined there was no evidence of an area of focal impairment consistent with tissue damage or loss due to traumatic brain injury for the assessed domains." (Tr. 23). The ALJ also found Plaintiff "would be able to perform detailed work based on testing and the conclusion of neuropsychologist Dr. Garlinghouse noting [Plaintiff] experienced no broad cognitive decline for the assessed domains and that there was no evidence of an area of focal impairment consistent with tissue damage or loss due to traumatic brain injury for the assessed domains." (Tr. 25). Essentially, the ALJ concluded Dr. Garlinghouse's opinions reflect Plaintiff's mental and cognitive limitations are not disabling or as limiting as Dr. McQuillen later opined.

Plaintiff does not really argue the ALJ failed to evaluate the supportability factor entirely; instead, she argues the ALJ erred by failing to discuss Dr. McQuillen's reliance on Dr. Garlinghouse's evaluation. However, the regulations do not require the ALJ to discuss every piece of evidence supporting an opinion when explaining the persuasiveness of medical provider's opinion. Instead, the ALJ must only explain how the ALJ considered the consistency and supportability of a medical opinion. See 20 C.F.R. § 404.1520c. As in this case, the ALJ may note that the physician's own treatment notes do not support the physician's opinion when discussing supportability. See *Cropper*, 136 F.4th at 815 (finding the ALJ adequately addressed supportability by discussing the provider's treatment notes in detail, "explaining that those notes included 'relatively intact mental status examination observations,' and reports of the plaintiff "consistently doing alright," as "[]n ALJ may properly consider a provider's own examination notes when determining whether that provider's opinion is supported."). Thus, although the ALJ's supportability analysis of Dr. McQuillen's opinions could have been more thorough or robust, the undersigned magistrate judge nevertheless finds it was adequate to satisfy the ALJ's obligation to perform a supportability analysis under the revised regulations. See *Cropper*, 136 F.4th at 814 (providing the Court's review of medical opinions under the revised regulations is limited "to

36

whether the ALJ adequately analyzed persuasiveness, including the supportability and consistency factors, not whether we agree with the ALJ's evaluation of the record evidence on those issues"); *Grindley*, 9 F.4th at 631 ("The ALJ's brevity is not reversible error.").

       ii.     *Dr. Ray*

Plaintiff argues the ALJ also erred in evaluating the opinions of Plaintiff's primary care physician, Dr. Ray, by failing to articulate sufficient reason to find them unpersuasive. Plaintiff contends the ALJ's determination that findings of "no acute distress" in Dr. Ray's examination notes detracted from Dr. Ray's supportability was error because the ALJ was relying on her own inferences as to the relevance of such notation. (Filing No. 15 at p. 29) (citing *Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017)). As to the ALJ's determination of consistency, Plaintiff asserts the ALJ erred in attributing so much weight to an incomplete note referring to an individual nearly half of Plaintiff's size "going to the gym three times a week to lift weights" when discounting Dr. Ray's opinion. (Filing No. 15 at pp. 30-31).

The ALJ found the opinions of one of Plaintiff's long-term treating physicians, Dr. Ray, "largely unpersuasive despite being explained and having some support in the findings[.]" Dr. Ray's assessed limitations included opinions that Plaintiff could not stand more than 20 minutes and would be unable to sit for more than 10 minutes straight; noted problems with Plaintiff's fine motor skills, an inability to learn new information, and with speech, communication, and balance when walking and standing; and that Plaintiff was unable to concentrate longer than five minutes; must avoid heavy lifting; and was unable to lift more than 5 pounds. The ALJ found Dr. Ray's assessed limitations were not supported by her own description of Plaintiff "as being in no acute distress nor are they consistent with the overall evidence including the report of going to the gym three times a week to lift weights and work on balance, or with the findings of normal or appropriate mood; normal behavior; grossly intact cognition and memory; appropriate and logical thought content; logical and goal directed thought processes; no word finding difficulties; and/or fair or normal insight and judgment."

The undersigned magistrate judge finds merit to Plaintiff's arguments on this issue. First, in finding Plaintiff's treating physician's opinions "largely unpersuasive," the ALJ appears to have relied on her own inferences and substituted her own judgment as to the meaning and significance of notations such as "no acute distress" and "normal or appropriate mood" when discounting Dr. Ray's opinions as to Plaintiff's limitations. No other medical opinion or evidence

in the record suggest that such notations are significant or detract from the specific limitations identified by Dr. Ray.  Nor do these generic notations necessarily explain how Dr. Ray's limitations are not supported by or are inconsistent with the record; for example, none of Dr. Ray's limitations refer to Plaintiff's "mood" or mental state, nor do such comments in anyway related to Dr. Ray's opinions regarding Plaintiff's fine motor skills or ability to stand no more than 20 minutes or sit for no more than 10 minutes.  See, e.g., *Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (concluding the ALJ "erred in relying on his own inferences as to the relevance of the notations 'no acute distress' and 'normal movement of all extremities' when determining the relative weight to assign to [two state agency medical consultant's] opinions.").

Aside from the ALJ's reliance on her own inferences about the meaning of notations, the ALJ also relies almost exclusively on an "incomplete" clinic note from Madonna Hospitals dated April 6, 2022; the ALJ found it extremely significant that this note indicates Plaintiff goes "to the gym three times a week to lift weights and work on balance," which the ALJ determined did not support Dr. Ray's physical limitations.  But as Plaintiff points out, the accuracy of this note is in serious question.  First, the note is states it is "incomplete."  Second, the remainder of the note describes an individual that is decidedly *not* Plaintiff: under social history, the note states Plaintiff's occupation is "retired" (Plaintiff reported to all her other medical providers she is disabled, not retired); she is single and lives alone (Plaintiff lives with her three minor children); denies tobacco usage (Plaintiff reported to all of her other medical providers she had resumed smoking, including at an appointment the month prior in March 2022, Tr. 703-704, and the month after in May 2022, Tr. 669-670); and the recorded vital signs list the patient's weight as 179.2lb and height as 64 inches (Plaintiff's height in every single other medical note indicates she is 5'11 or 5'11.5 and has consistently weighed between 295 to 300+ lbs). The fact that every other aspect of this incomplete note describes an individual other than Plaintiff provides serious doubts that the "gym three times a week to lift weights" statement was actually attributable to Plaintiff.

Additionally, over three years of medical records, nowhere else does Plaintiff tell any of her providers she has been going to the "gym" to "lift weights."  The only references to "lifting" contained in Plaintiff's records are repeated notations from physical therapy stating Plaintiff's evaluated functional limitations included "cooking, household chores, lifting objects," (Tr. 511, 526, 532, 591, 599, 619, 634, 683), that Plaintiff has "difficulty lifting and carrying" (Tr. 531-532), that "lifting the head from supine is painful and triggers her [headaches]" (Tr. 618, 627, 630,

1011), that she has "full shoulder ROM, lifting of arms," (Tr. 1057), has "difficulty lifting right leg up" (Tr. 677, 686), and symptoms of bilateral carpal tunnel when lifting (Tr. 1040). Plaintiff's physical therapy treatment notes discuss her physical therapy treatments performed in "open gym," but these treatments are never noted to involve "lifting weights" (Tr. 677, 686, 1104, 1111-1112, 1167-1168); physical therapy also "educated" Plaintiff that it would be beneficial for her sit-to-stand transfers and prolonged standing to do her "LAQ exercise either with her resistance bands or at the gym," (Tr. 678-679); and Plaintiff mentioned using an elliptical for "two minutes" at the gym, (Tr. 492). When asked at the hearing if she exercised, Plaintiff answered she was doing the home physical therapy exercises "they told me to do" and "water therapy." (Tr. 53).

The undersigned magistrate judge recognizes the reviewing court's role is not to "reweigh the evidence presented to the ALJ or to try the issue in this case de novo.'" *Dols*, 931 F.3d at 746 (8th Cir. 2019). And the Eighth Circuit has indicated the Court's review of medical opinions under the revised regulations is limited "to whether the ALJ adequately analyzed persuasiveness, including the supportability and consistency factors, not whether we agree with the ALJ's evaluation of the record evidence on those issues." *Cropper*, 136 F.4th at 814. At the same time, the Court's review is "more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp.'" *Scott*, 529 F.3d at 821. The issue before the Court does not appear to be an issue of conflicting evidence that the ALJ resolved. Instead, this appears to be an issue of the ALJ relying on *incorrect* evidence and the ALJ's substitution of her own judgment of the meaning and significance of notations in Plaintiff's records to completely discount a treating physician's opinion. The undersigned magistrate judge finds this was error, and that the ALJ did not "adequately" analyze Dr. Ray's opinions under the revised regulations. See *Cropper*, 136 F.4th at 814. This error was not harmless, as the ALJ's formulation of Plaintiff's RFC discounted Dr. Ray's limitations, which were more limiting than those included in Plaintiff's RFC. As such, the undersigned magistrate judge finds and recommends that remand is required so the ALJ can develop the record, if necessary, and adequately analyze the persuasiveness of Dr. Ray's opinions as required under 20 C.F.R. § 404.1520c. Accordingly,

**IT IS HEREBY RECOMMENDED** to the Honorable Susan M. Bazis, United States District Court Judge, that:

1.  Plaintiff's Motion for Order Reversing Decision of the Commissioner (Filing No. 14) be granted;

2.  The Commissioner's Motion to Affirm Commissioner's Decision (Filing No. 19) be denied; and

3.  The Commissioner's decision be reversed and remanded for further administrative proceedings consistent with the opinion set forth herein.

Dated this 6th day of August, 2025.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

A party may object to a magistrate judge's findings and recommendation by filing an objection within fourteen (14) days after being served with a copy of the findings and recommendation. NECivR 72.2.  Failure to timely object may constitute a waiver of any objection.